**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA,
PANAMA CITY DIVISION**

LEMUEL MCMILLAN,

     Plaintiff,

v.                                CASE NO. 5:13-cv-292 WS-GRJ

STATE OF FLORIDA, DEPARTMENT OF
CORRECTIONS, SAM CULPEPPER,
RICHARD COMERFORD, DONNIE G.
MAURER and RICARDO HAY.

     Defendants.

_____/

**DEFENDANTS DEPARTMENT OF CORRECTIONS, SAMUEL CULPEPPER,
RICHARD COMERFORD AND DONNIE G. MAURER'S
MOTION FOR SUMMARY JUDGMENT
WITH SUPPORTING MEMORANDUM OF LAW**

Defendants, State of Florida, Department of Corrections (DOC), and Samuel Culpepper,

Richard Comerford and Donnie G. Maurer, in their official capacities and individually, through

counsel and pursuant to rule 56(c), Federal Rules of Civil Procedure, and this court's Amended

Scheduling and Case Management Order [Doc. 85], move for summary judgment on plaintiff's

claims for relief as there are no genuine issues of material fact, and they are entitled to judgment

as a matter of law.  Defendants state the following in support of their motion:

    1.  Plaintiff, Lemuel McMillan's, claims against defendants DOC, Samuel Culpepper,

Richard Comerford and Donnie Maurer are as follows:

Count I of the Corrected Amended Complaint seeks relief against the DOC for authorizing former officer Ricardo Hay, in the scope of his employment, to commit sexual misconduct[1] against plaintiff while plaintiff was incarcerated.

Count II seeks relief against the DOC for negligence in: failing to provide adequate monitoring of plaintiff; failing to provide adequate monitoring of staff; failing to train staff, including defendants Samuel Culpepper, Donnie Maurer and Ricardo Hay, about misconduct (including sexual misconduct); failing to comply with recommended staff ratios; and failing to ensure safe conditions of confinement.

Counts III, IV and V seek relief against defendants Samuel Culpepper, Richard Comerford, and Donnie Maurer for negligence in: failing to provide adequate monitoring of plaintiff; failing to provide adequate monitoring of staff under their supervision; failing to train staff under their supervision about misconduct (including sexual misconduct); failing to comply with recommended staff ratios; and failing to ensure safe conditions of confinement.

Counts VI, VII and VIII seek relief against defendants Samuel Culpepper, Richard Comerford and Donnie Maurer under 42 U.S.C. s. 1983, for a violation of plaintiff's Eighth and Fourteenth Amended constitutional rights by defendants' failure to take reasonable safety measures to protect plaintiff from the assault by defendant and former officer Ricardo Hay.

In Count IX, plaintiff seeks relief solely against defendant Hay.  The Office of the Attorney General does not represent defendant Hay, and this motion and memorandum are not filed on his behalf.

---

[1] Hay pled nolo contendere on March 18, 2013, to one count of Sexual Misconduct with an Inmate (a third degree felony under s. 944.35(3)(b)2, Fla. Stat.) and one count of Felony Battery (a third degree felony under s. 784.041(1), Fla. Stat.).  Adjudication was withheld, and Hay was sentenced to 10 years' of probation.

2.  Plaintiff's claims stem from an incident while he was incarcerated at Northwest Florida Reception Center, during which defendant Ricardo Hay (who was a Correctional Officer working for the DOC at the time) ordered plaintiff to perform oral sex on Hay.  In the aftermath of the incident, Hay immediately resigned his employment with DOC, DNA evidence was recovered from Mr. McMillan's clothing, and this DNA evidence was used to convict Mr. Hay of two third degree felonies, including Sexual Misconduct with an Inmate, and Felony Battery.

3.  The actions taken by Hay as alleged by plaintiff were taken solely by him.  They were clearly outside the course and scope of his employment as a Corrections Officer, without the pretense of a lawful right to take such actions.   Even though the incident occurred while Hay was on duty at NWFRC, at no point did he have the authority to use his power to coerce sex.

4.  Moreover, the sole proximate cause of the damages claimed by plaintiff are the unforeseeable action taken by Hay, individually, while acting outside the scope of his employment.  Accordingly, the DOC enjoys immunity from liability under section 768.28(9)(a), Florida Statutes, and is entitled to summary judgment on counts I and II.

5.  Defendants Culpepper, Comerford and Maurer are also entitled to summary judgment as a matter of law on counts III, IV and V, because they also enjoy immunity under section 768.28(9)(a), Florida Statutes.  The act committed by Hay was unforeseeable; there was nothing in his employment background or in his performance on the job that would have put his supervisors on notice of his propensities.  The intervening criminal act committed by defendant Hay against plaintiff is the sole and direct proximate cause of plaintiff's alleged injuries, and it served to break any chain of causation between any act by defendants Culpepper, Comerford and Maurer, and the injuries claimed by plaintiff.  There is no competent evidence to support any

argument that there is a causal connection between allegedly negligent acts of defendants Culpepper, Comerford and Maurer, and any injury sustained by plaintiff.

6.  As for plaintiff's section 1983 claims against Culpepper, Comerford and Maurer, there is no competent evidence to support plaintiff's claims that the three defendants were deliberately indifferent to his constitutional rights by failing to ensure he was safe from Hay's actions. Specifically, there is no allegation that the three defendants personally participated in the incident with Hay, or that they authorized, encouraged or otherwise even knew of Hay's propensities before the incident happened.

7.  Plaintiff's claims appear to rest primarily on the contention that there was a history of sexual abuse and misconduct at NWFRC that put Hay's supervisors on notice of a need to correct alleged deprivations.  This contention is unsupported by any competent evidence.  In fact, the only relevant evidence adduced during the lengthy and encompassing discovery by plaintiffs establishes the opposite:  that during the five year period at issue, NWFRC substantiated only one claim of sexual misconduct (the very incident involving plaintiff), and that this rate is entirely consistent with the other prisons within the DOC.

8.  Plaintiff also contends that a pattern of non-sexual abuse of inmates can support his claim of deliberate indifference to the threat of *sexual misconduct* faced by plaintiff.   As with the claims of a pattern of sexual misconduct towards inmates, there is simply no competent evidence to support the contention that inmates at NWFRC were suffering from a widespread pattern of abuse.   Moreover, there is no support in the law for plaintiff's argument; for a pattern of violations to support a claim of deliberate indifference, the violations must involve facts substantially similar to those at hand.

9.   Accordingly, for the reasons set forth above, defendants DOC, Culpepper, Comerford

and Maurer are entitled to summary judgment on all counts as a matter of law.

## MEMORANDUM OF LAW

### I.  STATEMENT OF FACTS

GENERAL BACKGROUND

1.   Northwest Florida Reception Center (NWFRC) is a correctional facility in Chipley,

Florida, housing adult male inmates in minimum, medium and close management custody levels.

The main unit (that part of the facility relevant to the issues in this matter) houses about 1300

inmates.  (Exh 1, http://www.dc.state.fl.us/facilities/region1/110.html)

2.   At all material times, there were 5 open-bay and 3 cell housing units at NWFRC, and

specific areas designated for confinement of inmates. (Exh 1,

http://www.dc.state.fl.us/facilities/region1/110.html) (Exh 2, Deposition of Samuel Culpepper,

August 20, 2015 at p. 16)

3.   On May 20, 2008, plaintiff Lemuel McMillan was sentenced to 5 years in prison for

organized fraud and criminal use of personal identification. (Exh 3, FDOC Face Sheet) He was

committed to the custody of the DOC on June 3, 2008, and was incarcerated at NWFRC from

July 9, 2008 to May 13, 2009.  (Exh 4, inmate movement transfer history)

4.   At the time of defendant Samuel Culpepper's arrival as warden at NWFRC (July

2008), there were approximately 500 employees at the institution, and by the time he was

transferred elsewhere to serve as warden (August 2009) there were between 650 and 700.  (Exh.

5, Affidavit of Samuel Culpepper, at p. 2)

5.   Approximately 50% of the inmates housed at the main unit of NWFRC when Samuel

Culpepper was warden were on psychotropic medications.  The population of inmates was very

violent, high in security threat groups, and very difficult to manage.  (Exh 6, Deposition of Samuel Culpepper, October 5, 2011, in Seiffert v. DOC, 5:11 - cv-130-RS/GRJ at p. 13.)

6.   The facilities at NWFRC were expanded in 2008 to accommodate the opening of the reception center, and were under construction when Mr. Culpepper first arrived at the facility in July 2008.  Mr. Culpepper determined that there were a number of facility maintenance issues that needed to be addressed, and also determined that there were too many violent and aggressive inmates at NWFRC in open population, and that these inmates were bullying and stalking other inmates.  (Exh 2 at pp. 12 - 14).

7.   Mr. Culpepper applied the same effort to ensuring the safety of inmates and staff at NWFRC as he had at his previous institutions.  (Exh 2 at p. 15).  This included making the compound as safe as it could be, cleaning up the institution and setting higher expectations and standards.  (Exh 2 at p. 15).  He also testified that the pre-existing written procedures for inmate discipline are the ones he follows, but that he observed they were being only loosely enforced at NWFRC when he arrived in 2008.  (Id.)

8.   Plaintiff, Lemuel McMillan became aware of Samuel Culpepper upon Mr. Culpepper's arrival at NWFRC in 2008.  Mr. McMillan testified that Mr. Culpepper "walked the compound pretty often," and that life became very "structured" upon Mr. Culpepper's arrival.  (Exh 7, Deposition of Lemuel McMillan, May 8, 2015, at pp. 86- 88).  This meant inmate movement was more restricted, the inmates had to walk in lines, talking in the lines was not allowed, and all of the dorms could not meet in the recreational yard at the same time.  (Id. at 87).

9.   During his incarceration at NWFRC, plaintiff was housed in open-bay dormitory A. (Exh 4)  According to Mr. McMillan's understanding, the A-dormitory was the "honor dorm." (Exh 7 at p. 85).  He remained there until he was transferred on May 13, 2009.

10.   Other than the incident at issue in this matter, plaintiff testified that at no time during his incarceration at NWFRC did he receive any physical beating or abuse, and never had chemical spray used on him.  (Id. at 83, 84).  Moreover, he testified that he had no personal knowledge of any incidents involving beatings or abuse of other inmates at NWFRC.   (Exh 7 at p. 83).

11.   Mr. McMillan does not have specific knowledge of any of the allegations or claims against Richard Comerford or Donnie Maurer in this case.  (Id. at 88 - 89).

12.   Plaintiff was released from custody on November 22, 2011, in Ft. Lauderdale, Florida.  (Exh 3)

SGT. DONNIE MAURER

13.   Defendant Sergeant Donnie Maurer has worked for the Department of Corrections at NWFRC since 1996, after retiring from the United States Air Force.  (Exh 8, Deposition of Donnie Maurer, 7-22-15, at pp. 4, 5)  He was promoted to the rank of Sergeant in 2003, and has held that position at NWFRC since then.   (Id.)

14.   From 2003 through the date of the incident (May 12, 2009), Sgt. Maurer worked as a housing supervisor, supervising the activities of inmates in a housing unit.  (Exh 8 at p. 5).   His regular shift from 2006 to the date of the McMillan incident was the 3:00 p.m. to 11:00 p.m. shift.  (Exh 8 at p. 7).

15.   At all times material to this matter, a typical evening shift assignment involved a correctional officer and housing sergeant being assigned to a specific dormitory.  It was not uncommon for one or the other to be left alone to supervise the dormitory while the other was assisting with other duties outside the dormitory. (Exh 9, Deposition of Richard Comerford, 8/20/15 at 29.)

16.  One of the regular times when an officer was left to supervise a dormitory by himself was during dinner.  As a senior staff member, Sgt. Maurer was expected to accompany the inmates to dinner, and stay for the duration of the meal.  (Exh 8 at p. 8).  Large numbers of inmates from different threat groups ate together at the same time, and senior staff were needed to supervise dinner to ensure safety and security of the inmates.  (Exh 8 at p. 8).

RICHARD COMERFORD

17.  Defendant Richard Comerford was Assistant Warden of NWFRC from 2007 - 2011, including during all times pertinent to the allegations relating to plaintiff.  (Exh 10, Affidavit of Richard Comerford, at p. 2).

18.  Mr. Comerford testified that he has no personal knowledge of the facts and circumstances of the incident involving plaintiff and former officer Ricardo Hay.  (Id.)

19.  Mr. Comerford also testified that he has not been made aware at any time of any other allegations against Ricardo Hay, involving inmate abuse or sexual misconduct between Hay and any other individual.  (Id.)

20.  Mr. Comerford testified that he could not recall any instance when chemical agents were used against an inmate who was not disruptive or disorderly, where correctional staff were encouraged or directed to use chemical agents as a disciplinary tool.  (Exh 9 at 22 - 23)(Ex 11, Comerford deposition of 10/5/11 at pp. 10 - 11), or where correctional staff were encouraged to rough up or physically abuse inmates. (Exh 9 at p 25)

21.  He also denied having any knowledge of any instances where an officer who reported abuse of inmates was subject to discipline and testified clearly that during his career with the department, he has not condoned or supported the abuse of inmates.  (Exh 9 at p. 27)

SAMUEL CULPEPPER

22.  Defendant Samuel Culpepper, currently Regional Director (Region I), has worked for the department since 1979.  (Exh 2 at p. 6).   Before appointment to his current position, Mr. Culpepper was a warden for 10 years at various facilities around the state.  (Exh 5, Affidavit of Samuel Culpepper, September 30, 2015, p. 2).   He was warden at NWFRC between July 2008 and August 2009.  (Exh 2 at p. 6).

23.  At all times during his tenure as warden at NWFRC (and at all times during his career with DOC), Culpepper has done everything he could within the limits of his authority to minimize the risk of inmate abuse and to try to create an atmosphere at NWFRC where abuse would not occur.  He testified that he does not condone physical abuse of inmates, and does not condone misuse of chemical agents."  (Exh 2 at p. 63).

24.   Mr. Culpepper did not recall personally knowing plaintiff while Mr. Culpepper was warden at NWFRC.  (Exh 2 at p. 31).

25.  Mr. Culpepper did recall former officer Hay from seeing him on the compound during work hours.  (Id. at 32).

26.  Mr. Culpepper has no personal knowledge of the facts and circumstances surrounding the incident between plaintiff and Hay, but was made generally aware of the allegations within a short period of time after the incident occurred.  (Exh 5 at p. 3).  He was advised of the incident by the institutional inspector from the Office of the Inspector General who was assigned to investigate the matter.  (Id.)

27.  Mr. Culpepper testified about the steps taken after Mr. McMillan reported the incident with Hay, including medical evaluation, and a transfer to confinement ("a safe

environment) for his own safety by minimizing the people who could come in contact with Mr. McMillan.  (Id. at 36).

28.  Mr. Culpepper recalled that the Inspector General's office was scheduled to interview Ricardo Hay about the incident on Hay's next regular workday, which was within 3 or 4 days of the incident.  (Id. at 39).  However, when Hay arrived for the interview, he refused to be interviewed and resigned instead.  (Id. at 33).

29.  Mr. Culpepper had no knowledge of what happened to Hay after that other than a brief mention of Hay on the local news channel about a year later.  Culpepper had no additional information associated with the progress of the investigation, either, because he received a transfer assignment to another institution in August 2009.  (Id. at 39).

30.  Mr. Culpepper testified that he had no "prior knowledge of Ricardo Hay abusing any inmates in any form or fashion."  (Id. at 35).  He also denied that anyone had reported to him any concerns about Hay "breaking any rules, smuggling things into the prison, mistreating inmates in any way prior to the assault" of plaintiff.  (Id.)

31.  Mr. Culpepper testified that staff are told not to take inmates into laundry rooms for counseling.  (Id. at 52).  This information was communicated to staff at staff meetings.  (Id.)

32.  Mr. Culpepper testified that could recall no situation during his tenure as warden at NWFRC when chemical agents were used on an inmate without justification. (Exh 2 at p. 57 - 58) (Exh 6, Deposition of Samuel Culpepper, October 5, 2011, in Seiffert v. DOC, 5:11-cv-130-RS/GRJ, at pp. 93 - 94, p. 103).   Further, at no time did he order or encourage any staff to use pepper spray in a situation where an inmate was not disorderly or causing a disturbance.  (Exh 6 at p. 93 - 94, p. 103) and  (Exh 2 at p. 57 - 59, 60, 62)

33.  To the best of his knowledge, during Mr. Culpepper's tenure as warden at NWFRC, chemical agents were used according to the policies governing use of force against inmates, rule 33-602.210.  (Exh 5 at p. 3); (Exh 6 at p. 96).

34.  Mr. Culpepper further testified that while he was warden at NWFRC he was not made aware that two officers at the institution had made statements to the Office of the Inspector General that staff had used unauthorized uses of force against inmates.  (Exh 6 at p. 105 - 107).

35.  Neither of the officers notified Mr. Culpepper of their allegations of unauthorized uses of force, nor did either captain notify Mr. Culpepper that either captain objected to such uses of force.   (Exh 6 at p. 107) and (Exh 2 at p. 62)

RICARDO HAY

36.  Defendant Ricardo Hay sought employment for the first time with the DOC in August 2007.  (Exh 11, Personnel File for Ricardo Hay, p. 45 - 63).   The DOC verified Hay's service in the United States Air Force and honorable discharge (Exh 11 at p. 76) and all of his employment between March 2002 and the date of his application with the DOC in August 2007.

37.  Additional background investigation was conducted through a check with local law enforcement and a review of the FCIC and NCIC databases.  (Exh 11 at p. 69 - 75), which confirmed the criminal history he had voluntarily disclosed:    two previous misdemeanors including a charge of disorderly conduct in 1998 as a juvenile (Exh 11 at p. 72) and a misdemeanor charge of carrying a concealed weapon in 1999.   (Exh 11 at p. 52).

38.  At the time of his application with the DOC, Mr. Hay had been employed for two years as a correctional officer with the Corrections Corporation of America at the Bay County Jail after receiving certification as a correctional officer.  (Exh 11 at p. 58).   His employer's evaluation of his employment was positive, indicating that Mr. Hay's job had required him to

exercise care, custody and control of inmates, and that his performance had been "excellent." (Exh 11 at pp. 58)

39.  In fact, all previous employers who were contacted indicated that they would have rehired Mr. Hay had he requested a job with them.  (Exh 11 at p. 58 - 63).

40.  In short, Hay's background investigation was clean, and he presented as a strong candidate for a correctional officer position.

41.  Mr. Hay was first hired by the DOC on October 19, 2007.  (Exh 11 at p. 44), and was assigned to NWFRC (previously called Washington, CI) (Exh 11 at p. 5)

42.  Mr. Hay was employed by the DOC at NWFRC from October 1997 through May 18, 2009.  (Exh 11 at p. 66 - 67)   His performance evaluations between October 2007 - February 29, 2008, and between March 1, 2008 and February 28, 2009,[2] indicate that his performance always met or exceeded expectations.  In fact, his performance showed improvement over time across all categories.   In particular, his supervisor commented that he was hard-working and energetic, and willingly accepted and executed additional assignments and projects.  (Exh 11 at p. 6 - 17).

43.  During his time working at NWFRC, neither the assistant warden nor the warden had any knowledge of any inappropriate behavior by Hay towards any inmate.  (Exh 9 at p. 29, 30.)

44.  On May 18, 2009, he resigned under investigation associated with the incident involving Mr. McMillan.  (Exh 11 at p. 66 - 67).

THE INCIDENT ON MAY 12, 2009

---

[2] Hay resigned his employment with DOC on May 18, 2009, in the aftermath of the McMillan incident, so this is his final performance evaluation.

45.  On the evening of May 12, 2009, Sgt. Maurer was assigned to supervise A Dormitory, along with defendant Hay (Exh 12, Sustained Investigation and Investigative Report for Case No. 09-1-3343, at pp. 9 )(the "McMillan IG investigative report").   According to the A-dormitory Housing Unit Log for May 12, 2009, 136 inmates were housed in that unit on that night.  (Id.)

46.  Sgt. Maurer accompanied A-dormitory inmates to the dining hall at 4:20 p.m., with defendant Hay remaining in A-dormitory.  By 7:00 p.m., Sgt. Maurer had returned to A-dorm for the evening.  (Exh 13, Affidavit of Sgt. Donnie Maurer, September 14, 2015, p. 2)

47.  The shift ended for both men at 11:00 p.m.  (Id.)

48.   Sgt. Maurer testified at deposition that he has no knowledge of and has never witnessed any inmates at NWFRC having been subjected to sexual violence by staff.  (Exh 8 at p. 13).

49.  In particular, although he was the housing sergeant assigned to A-dormitory on the evening of the incident, he was not advised by anyone upon his return to A-dormitory that evening that any incident had occurred.  (Exh 13 at p. 2).   Plaintiff made no attempt at any time to notify Sgt. Maurer that something had happened, despite Sgt. Maurer's presence in A-dormitory between 7 p.m. and the end of Sgt. Maurer's shift at 11 p.m. that evening.   (Id.)  Sgt. Maurer has no direct knowledge of the incident involving Mr. McMillan.  (Id.)

50.  Plaintiff Lemuel McMillan testified at length about his interactions with Ricardo Hay in the period leading up to the incident on May 12, 2009.  (Exh 7 at p. 37 - 40).  According to Mr. McMillan, although he and Ricardo Hay were not friends (Id. at 37), he recalled Hay having joked with him about plaintiff's homosexuality, but not in a mean-spirited way (Id. at 39).  In fact, McMillan thought Mr. Hay's jokes were funny, and laughed at them, and he was understood

by McMillan and the other inmates to be friendly, and not aggressive.  (Id. at 39, 40).   He also testified that before the incident on May 12, 2009, he thought "it was more like [Hay] was just a nice officer.  He was a cool officer.  He was -- he was [an] approachable officer."   (Id.)  He confirmed that Hay had not been mean to him at all, and never indicated that he was interested in McMillan in a sexual manner.  (Id. at 40)

51.  According to Mr. McMillan, around 6:30 on the evening of May 12, 2009, Ricardo Hay called him into the laundry room of A-dormitory and directed him to perform oral sex on Mr. Hay.  (Exh 12 at p. 9)

52.  After he left the laundry room, Mr. McMillan returned to his bunk for the night.  At the time of morning call-out for work assignments, plaintiff notified his work supervisor, Sgt. Jose Moreno, that he had been assaulted.  (Exh 12 at p. 8)

53.  Plaintiff was immediately taken to the infirmary for a medical evaluation, and the Office of the Inspector General was notified.  (Exh 12 at p. 8 - 9)  The investigator assigned to the investigation placed Mr. McMillan in administrative confinement for his own protection. Mr. McMillan was transferred from NWFRC later that same day, May 13, 2009. (Exh 12 at p. 42) and (Exh 4)

54.  The Inspector General's office was scheduled to interview Ricardo Hay about the incident on Hay's next regular workday, but when Hay arrived for the interview, he refused to be interviewed and resigned instead.  (Exh 2 at 33).

55.  A t-shirt was collected by the Inspector General's office on May 13, 2009 and was delivered to the FDLE laboratory in Tallahassee on May 14, 2009 for testing to determine the nature of the bodily fluids. (Exh 12 at p. 10)

56.  On June 17, 2009, FDLE returned a report to the Inspector General's office, with a determination that the bodily fluids were from semen.  (Exh 12 at p. 22-23) A search warrant was issued by the circuit court for Washington County for the retrieval of buccal swabs. That search warrant was not executed.  (Exh 12 at p. 43-44)

57.  No further action was taken on the investigation until June, 2010. A second search warrant was issued, DNA evidence was retrieved from Ricardo Hay, and he was arrested. (Exh 12)

ALLEGATIONS BY RESHAWN BROWN

58.  Reshawn Brown is currently incarcerated at Lake Butler Reception Center.  He was previously in the custody of the DOC, at NWFRC during the period between May 21, 2008 and January 8, 2009.

59.  Reshawn Brown has provided an unsworn statement alleging an incident of sexual abuse by former officer Hay while he was at NWFRC.  He also alleges that he unsuccessfully attempted to file a written complaint about the incident with defendants Maurer and Culpepper. No admissible evidence has been presented to corroborate this allegation and at his recent deposition on September 24, 2015, Mr. Brown refused to testify about the alleged incident.

60.  Sgt. Donnie Maurer testified at deposition that he does not know Reshawn Brown. (Exh 8 at p. 13)   Maurer denied that any inmate has handed him a grievance which he (Maurer) then destroyed.  (Exh 8 at p. 13).

61.  Sgt. Maurer specifically denies ever having received, from Reshawn Brown or any other inmate, any information regarding an alleged sexual assault by Ricardo Hay of Reshawn Brown, and further denies having destroyed any information.  (Exh 13 at p. 2, 3)

62.  Samuel Culpepper also specifically denies ever having received any information regarding an alleged sexual assault by Ricardo Hay of Reshawn Brown, and further denies having destroyed or ignored any such information.  (Exh 5 at pp. 8-9)

UNSUBSTANTIATED AND SUBSTANTIATED INCIDENTS OF
SEXUAL MISCONDUCT (AS DEFINED BY THE PRISON RAPE ELIMINATION ACT)
 AT NWFRC BETWEEN 2004 AND 2009

63.  In 2003, Congress passed the Prison Rape Elimination Act to develop national standards for the detection, prevention, reduction, and punishment of prison rape.   See, Prison Rape Elimination Act, PL 108-79, 42 USC s 15601.

64.  The Bureau of Justice Statistics (BJS) within the Department of Justice collects annual administrative data from reporting states of allegations, by inmates, of sexual victimization by other inmates or staff, and whether those allegations have been substantiated. (*See generally,* Exhibit C to Exh 14, Affidavit of Max A. Linn, Ph.D.)

65.  Facilities within the DOC, including NWFRC, have been collecting and reporting incidents of sexual victimization to the BJS since 2004.  Id.

66.  At all material times, when an inmate at NWFRC filed a complaint of an incident of sexual battery (staff-on-inmate), improper sexual conduct (staff-on-inmate), sexual misconduct (staff-on-inmate), sexual harassment (staff-on-inmate), sexual battery (inmate-on-inmate) or other sexual offense (inmate-on-inmate), the incident was recorded in the DOC's Management Information Notification System, and assigned an internal PREA tracking number.   (Exh 15, Defendant's Verified Supplemental Responses to Plaintiff's First Set of Interrogatories, at p. 11 – 12)

67.  After entry into the DOC's MINS system, an investigation of the alleged incident, in accordance with the DOC's investigative policies, was conducted by the DOC's Office of the

Inspector General.  Id. at p. 12. If there is sufficient evidence to determine that the incident

occurred, it is recorded as substantiated in the DOC's Bureau of State Investigations' case

summary system (BSI).  (*See generally,* MINS and BSI reports from 2004 - 2009, Exhibits A

and B to Exh 14)

68.  Data from the MINS system was used to report to the BJS aggregated statewide data

relating to the total number of allegations of sexual victimization for that year.  The data was

reported on federal Form SSV-2.  (Exh 16, Florida DOC's SSV-2 forms for years 2004 – 2009)

69.  Substantiated incidents of sexual victimization are reported individual on a separate

form: federal Form SSV-1.

70.  The only substantiated incident of sexual victimization at NWFRC during the

material period was the incident involving Mr. McMillan.  However, the DOC did not prepare a

SSV-1 form with respect to Mr. McMillan's incident.  (Exh 17, Affidavit of David Ensley,

August 17, 2015 at p. 2)

DOC'S EXPERT WITNESS

71.  Upon reviewing the DOC's MINS and BSI data for the relevant five-year period, and

comparing it to the data published by the BJS with respect to all Florida institutions, the DOC's

expert statistician, Max A. Linn, Ph.D., concluded:

- There was no increase in the number of allegations of sexual victimization in all four PREA categories over the five-year time period relevant to this matter;

- Substantiation rates at NWFRC for all 4 PREA categories of sexual victimization were consistent during the five-year period with substantiation rates at all Florida prisons during the same period;

- All NWFRC inmates who timely reported a rape were given a medical examination, and a rape kit, and had physical evidence collected on their behalf;

17

- There is no data to support any conclusion that allegations of sexual victimization at NWFRC during the relevant period were improperly or incompletely investigated.

(Exh 14 at p.3)

72.  Dr. Linn also concluded that there appears to be no statistically valid anecdotal (i.e., non-numeric) data in plaintiff's expert witness' report to support any conclusion regarding allegations of non-sexual abuse at NWFRC during the five-year period, or any conclusion regarding the investigation of such allegations of non-sexual abuse.  Id. at 7.

GENERAL SAFETY AND SECURITY MEASURES AT NWFRC
FROM 2004 - 2009

73.  From 2004 - 2009, NWFRC was subjected to regular audits by the American Correctional Association.  (Exh 18, redacted audits performed on NWFRC in 2007, 2009, and 2012)

74.  At all times during the periods reviewed by the ACA audits, NWFRC met the relevant standards for measures necessary for the safety and security of the inmates and staff. (*See generally,* Exh 18)

## II ANALYSIS

SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law.

In evaluating a motion for summary judgment, the court must view the evidence and all factual inferences therefrom in a light most favorable to the party opposing the motion.  Burton

v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  If defendants satisfy their initial

burden under rule 56(c), and demonstrate the absence of a genuine issue of material fact, plaintiff

must then demonstrate the existence of a material issue precluding summary judgment.  Id.

 To meet this burden, plaintiff must identify specific facts which raise a genuine issue for trial.

See, Celotex v. Catrett, 477 U.S. 317, 324 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is

insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to

find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  The failure of proof concerning an essential

element of the non-moving party's case necessarily renders all other facts immaterial, and

requires the court to grant the motion for summary judgment.  Celotex, 477 U.S. at 322-23.


PLAINTIFF'S NEGLIGENCE CLAIMS

Plaintiff's claims in count I that the sexual misconduct committed by defendant Hay were

committed while acting in the course and scope of his employment with DOC is misplaced.  It is

simply contrary to the plain language of the enabling statutory provision.  Section 768.28,

Florida Statutes, provides the basis for the state's limited waiver of sovereign immunity in tort

actions.  Specifically, Section 768.28(9)(a) provides as follows:

> The state or its agencies or subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

The DOC may be liable only if Hay, in committing the sexual misconduct against

plaintiff, did so while acting within the course and scope of employment and without bad faith.

There is simply no dispute that the acts of defendant Hay, as alleged by Plaintiff, were outside the course and scope of his employment as a Corrections Officer. There is no evidence to support the contention that any of the defendants ever authorized, encouraged or condoned Hay, or for that matter, ANY correctional officer, in engaging in sexual misconduct with plaintiff or any inmate. The use of coercive sex is not authorized by any DOC policy or rule, nor was it authorized or condoned by defendants Culpepper, Comerford or Maurer.

In Casey v. City of Miami Beach, 789 F.Supp.2d 1318 (S.D. Fla. 2011), the court considered whether a police officer's actions in the sexual battery of a woman who had been taken into custody by the officer were committed in the course and scope of the officer's employment with the City of Miami Beach. The defendant had moved to dismiss the allegations, arguing that section 768.28(9)(a), Florida Statutes, precluded the imposition of vicarious liability for the alleged sexual battery committed by the officer. In granting the motion to dismiss, the court rejected the "conclusory allegations" of the complaint that the officer was acting within the course and scope of his employment, and that his actions were not committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights. Instead, the court found there was no construction of the facts, which included that the officer sexually assaulted the woman subsequent to her arrest, which would support the claim against the City. Id. at 1321.

In support of its ruling, the Casey court cited Mason v. Fla. Sheriffs' Self-Ins. Fund, 699 So.2d 268 (Fla. 5th DCA 1997) wherein the court found that, "[e]ven though [the accused officer] was on duty, in uniform, and charged with the responsibility of serving a warrant, in no way did he have the authority to use his power to coerce sex. Because there was not even the pretense of

lawful right in [the accused officer's] performance of this act, it was not within the course and scope of his employment." Id. at 270.

The facts of the instant case are materially indistinguishable from Casey. There is simply no construction of the facts in which the arsenal of tools relied upon by a correctional officer employed by DOC includes the use of coercive sex. Moreover, because Hay's actions, in constituting a sexual crime, cannot support a cause of action for vicarious liability, DOC is entitled to summary judgment as to Count I of the Corrected Amended Complaint. (*see* Duquesne v. City of Miami Beach, 2012 WL 3061603 (S.D. Fla. 2012), reiterating the that sexual battery is, by definition, outside the course and scope of a law enforcement officer's employment).

Similar to the claims in count I, plaintiff alleges in count II that defendant DOC's negligent actions and omissions resulted in the alleged sexual assault by defendant Hay. The sole proximate cause of the damages of which plaintiff complains, however, was the unforeseeable actions by Hay in committing the alleged sexual battery. As previously stated in response to Count I, the department is not liable for the actions of defendant Hay under section 768.28(9)(a), Florida Statutes, when his actions are so clearly outside the course and scope of his employment. The immunity enjoyed by defendants is not defeated simply by the recitation of a laundry list of conclusory allegations which plaintiff complains constitute negligence.

Counts III, IV and V of the Corrected Amended Complaint allege negligence against individual defendants Culpepper, Comerford and Maurer respectively. Each individual defendant was during the time period relevant to this lawsuit an employee of the Department of Corrections, and each remains so employed at present.

A state employee retains personal immunity for "any act" committed in the course and scope of employment, so long as the act was <u>not</u> done with "bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." § 768.28(9)(a), Fla. Stat. (2009).  Because there is insufficient evidence to support the conclusory allegations that the individual defendants Culpepper, Comerford and Maurer acted outside the course and scope of their employment or in a manner exhibiting a wanton and willful disregard for inmate safety, these defendants are entitled to summary judgment.

Only Hay's actions fall outside the course and scope of his employment and it is Hay's actions alone which are the sole proximate cause of plaintiff's alleged injury. Proximate cause is not possible cause.  "Foreseeability and proximate cause are essential principles of negligence actions that must be alleged and proved."  <u>State v. Simer</u>, 363 So. 2d 357, 360 (Fla. 1st DCA 1978).  The Florida Supreme Court has explained that when an intervening criminal act *is foreseeable,* "the original actor's negligence may be considered the proximate cause of the loss, and he may be liable, notwithstanding the intervening criminal act."  <u>Nicholas v. Miami Burglar Alarm Co., Inc.</u>, 339 So. 2d 175, 179 (Fla. 1976).  However, "[s]ince a person usually has no reason to foresee the criminal acts of another, it has been generally held that an intervening criminal act breaks the chain of causation, and therefore the original negligence of the defendant cannot be the proximate cause of the damage resulting from the intervening criminal act."  <u>Id.</u>

Despite the exhaustive nature of the discovery in this matter, no evidence whatsoever supports a conclusion that any of the individual defendants had any reason to know of defendant Hay's propensities.  His pre-employment background check was clear, his previous employers all gave him very positive recommendations, his performance evaluations in the year before the incident with plaintiff were positive, and plaintiff himself described defendant before the

incident as one of the "cool" and "nice" officers.   In fact, plaintiff himself testified that Hay's behavior at the time of the incident was a complete departure from his observations of him before the incident.

An actual causal connection is an indispensable requirement of an action for negligence. Asgrow-Kilgore Co. v. Mulford Hickerson Corp., 301 So.2d 441, 444 (Fla. 1974).  A mere relation or connection between negligence and an injury is not sufficient to establish liability. Rather, the cause must be proximate, not remote. See CSX Transp., Inc. v. McBride, 131 S.Ct 2630, 180 L. Ed. 2d 637 (2011).  Proximate cause exists only when there is a natural, direct and continuous sequence between a defendant's act and the plaintiff's injury so that it may be said that but for the act, the injury would not have occurred.  General Telephone Company of Florida v. Choate, 409 So.2d 1101, 1103-1104 (Fla. 2d DCA 1982).

The evidence adduced during lengthy and encompassing discovery has wholly failed to support the conclusory allegations contained at counts III, IV and V of the Corrected Amended Complaint by failing to produce evidence to support the causal connection between the alleged negligent acts and the sexual misconduct with plaintiff.  Importantly, there exists no evidence beyond these conclusory claims to suggest that defendants acted in a manner exhibiting a wanton and willful disregard of plaintiff's safety.  Accordingly, there is no loss of the immunity afforded by section 768.28(9)(a), Florida Statutes, and defendants Culpepper, Comerford and Maurer are entitled to dismissal of the negligence claims against them as a matter of law.

PLAINTIFF'S SECTION 1983 CLAIMS

In counts VI - VIII of the Corrected Amended Complaint, plaintiff asserts that his Eighth and Fourteenth Amendment rights were violated when Culpepper, Comerford, and Maurer were deliberately indifferent to his rights.  He alleges that the three defendants, individually, failed to

take action to prevent sexual battery, including a failure to promulgate or enforce anti-sexual-battery policies and a failure to train or supervise other employees or subordinates.

Deliberate indifference is a "stringent standard of fault." Rudd v. Tatum, 2013 WL 4017333 (N.D. Fla. August 7, 2013). To state a successful deliberate indifference claim, a plaintiff must show that a defendant has subjective knowledge of a risk of serious harm and a disregard for that risk by conduct greater than mere negligence. West v. Tillman, 496 F.3d 1321, 1327 (11th Cir. 2007).

Simple human error is not deliberate indifference. Tillman, 496 F.3d at 1327. Nor does a negligent actor have the requisite state of mind for section 1983 claims. Davidson v. Cannon, 474 U.S. 344, 347 (1986). Only grossly negligent or deliberately indifference will amount to a section 1983 violation. Cannon v. Macon County, 1 F.3d 1558, 1563-64

The Eleventh Circuit does not recognize any form of vicarious liability, including *respondeat superior*, as a basis for section 1983 liability. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003); *see also*, Valdes v. Crosby, 390 F.Supp.2d 1084, 1099 (MD Fla. 2005)(supervisory officials are not liable under section 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability). Therefore, when attempting to bring claims of deliberate indifference against supervisory officials, as plaintiff attempts here, he must either allege (1) personal participation in the violation by supervisors; or (2) a "causal connection" between the actions of the supervising official and the alleged deprivation. Tatum, 2013 WL 4017333 at *8 (quoting Jenne, 326 F.3d at 1360).

Plaintiff has not alleged personal participation by Culpepper, Comerford, or Maurer in the sexual misconduct involving plaintiff, nor is there any evidence whatsoever that would support such a claim. There is also no evidence that Culpepper, Comerford or Maurer issued

specific directions to Hay to engage in sexual misconduct with plaintiff.  Therefore, plaintiff then must demonstrate a causal connection between each defendant's wrongful actions and the sexual misconduct involving plaintiff.

The causal connection can be established in any of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) when a supervisor's "'custom or policy... result[s] in deliberate indifference to constitutional rights'"; or (3) "when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'"  Jenne, 326 F.3d at 1360.   The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.  Valdes at 1099.  Where an official has failed to property train or supervise his employees, and knows of the resulting constitutionally deficient conditions of incarceration, personal participation by the official is not necessary to establish supervisory liability.  Valdes at 1101.

In this case, there is simply no evidence to support a contention that there was such widespread abuse of inmates as to put the defendants on notice, or that any custom implemented by the defendants resulted in deliberate indifference to the inmates' constitutional rights.  As discussed at length by the DOC's expert statistician, the numeric data clearly supports a conclusion that incidents of sexual victimization at NWFRC did NOT increase over the 5 year period and that the rate at which incidents of sexual victimization were substantiated was consistent with the rates at other Florida prisons during the same time period.

In other words, because the rate at which substantiated incidents of sexual victimization were occurring at NWFRC was the same as at other institutions during this period, it is simply

not valid to conclude that there was anything anomolous occurring at NWFRC sufficient to put any supervisory officials on notice.

Defendants' expert also concluded that there is NO statistically valid numeric or anecdoctal evidence (or evidence of any kind) to support any conclusion of widespread abuse of inmates of any kind. The uncorroborated statements of a very small number of employees cannot suffice as statistically valid data to support a finding regarding a pattern of abuse. As a final point, during the years at issue, NWFRC met all safety and security standards established by the American Correctional Authority, as evidenced by the audits conducted every other year at the facility.

Where a plaintiff attempts to show deliberate indifference by supervisory officials through a pattern of past violations and a subsequent failure to respond, a simple list of complaints, without more, does not demonstrate a violation of the Eighth or Fourteenth Amendments. Shehada v. Tavss, 965 F.Supp.2d 1358, 1373-74 (S.D. Fla. 2013). "The number of complaints bears no relation to their validity." Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987). Instead, the plaintiff must show that defendant had actual or constructive notice of a "flagrant and persistent pattern of violations." Goebert v. Lee Cty., 510 F.3d 1312, 1332 (citing *Tillman*). "The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." Valdes at 1099.

Some problems have an obvious level of impropriety to everyone. Sexual battery is one of those problems. *Tatum,* 2013 WL 4017333 at *9 ("…the illegality of sexual assault is obvious…."). In *Tatum,* two sheriffs were found not to be deliberately indifferent to their female inmates' constitutional rights after several sexual batteries against them by a rogue officer. This court held that entities and decision-makers are allowed to rely on the common sense of their

employees not to commit crimes, and did not require a formal policy or training requiring their employees to follow the law.  Instead, without actual or constructive notice of a particular employee disobeying the law, the sheriffs were not deliberately indifferent to the constitutional rights of their inmates.  This very point was made in testimony by defendant Culpepper, who noted that risk of harm to inmates is lowered in the first instance because of the obligation on staff at all times not to "knowingly, intentionally, and deliberately put inmates or put people in situations" that violate the rules.

In summary, defendants could not have known in advance of the incident that Hay would engage in that kind of behavior.  Similarly, although plaintiff's complaint is full of hyperbole and exaggeration, there is simply no credible evidence to support his claims that there was a widespread pattern of abuse, much less a widespread pattern of sexual misconduct and abuse at NWFRC in the years leading up to his incident that supports liability under section 1983. Defendants simply did not nor could not anticipate the harm that would be perpetrated by  Hay.

WHEREFORE, based on the evidence and arguments presented above, defendants DOC, Samuel Culpepper, Richard Comerford and Donnie Maurer respectfully request that the court enter an order granting defendants summary judgment as a matter on all counts of the Corrected Amended Complaint.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL

/s/ Britt Thomas____
Britt Thomas
Chief Assistant Attorney General
Fla. Bar No. 962899

Britt.Thomas@myfloridalegal.com

Elizabeth Teegen
Assistant Attorney General
Fla. Bar No. 833274
Elizabeth.Teegen@myfloridalegal.com
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 1st day of October, 2015, I electronically filed the

foregoing with the Clerk of Court using CM/ECF system, which constitutes electronic service

pursuant to Fed.R.Civ.P. 5(b)(2)(D) and N.D. Fla. Loc. R. 5.1(A)(6), and served a copy by US

Mail to Ricardo Hay, 6724 Pridgen Street, Panama City, FL 32404.


/s/ Britt Thomas __
Britt Thomas