IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

LEMUEL MCMILLAN,

     Plaintiff,

v.                           CASE NO. 5:13-cv-292-WS-GRJ

DEPARTMENT OF CORRECTIONS,
et al.,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff initiated this case by filing a complaint in the 14th Judicial

Circuit Court for Washington County asserting claims pursuant to 42 U.S.C

§ 1983 and state tort law; Defendants removed the case to this Court.  The

Complaint stems from a sexual assault by a corrections officer upon

Plaintiff while Plaintiff was in the custody of the Department of Corrections

(DOC) at Northwest Florida Reception Center (NFRC). The named

Defendants are the DOC and four individual NFRC officials and officers,

including Ricardo Hay, the corrections officer who pleaded guilty to

assaulting Plaintiff.[1]   ECF No. 4-11.  The case is presently before the

---

[1]Hay was served while the case was pending in state court and filed a *pro se* answer denying the allegations, but has not otherwise participated in this case.  *See* ECF No. 4-2, 4-3.

Court upon Defendants' Motion for Summary Judgment, ECF No. 158.

Plaintiff has filed a response in opposition to the motion, ECF No. 171, and

Defendants have filed a reply, ECF No. 175.  The motion has been referred

to the undersigned for recommended disposition.  For the following

reasons, the undersigned recommends that the motion be denied.

## I.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of

summary judgment is appropriate only when the Court is satisfied that

"there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law."  In applying this standard, the

Court must examine the pleadings, depositions, answers to interrogatories,

and admissions on file, together with any affidavits and other evidence in

the record "in the light most favorable to the nonmoving party." *Samples on

Behalf of Samples v. Atlanta,* 846 F. 2d 1328, 1330 (11th Cir. 1988).  As the

Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the

moving party bears the initial burden of establishing the nonexistence of a

triable issue of fact.  If the movant is successful on this score, the burden

of production shifts to the non-moving party who must then come forward

with "sufficient evidence of every element that he or she must prove."

*Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-

moving party may not simply rest on the pleadings, but must use affidavits,

depositions, answers to interrogatories, or other admissible evidence to

demonstrate that a material fact issue remains to be tried.  *See Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome*

*Credit Corp.*, 408 F.3d 773, 785-86 (11th Cir. 2005).

## II.  DISCUSSION

### A.  Plaintiff's Claims

The assault occurred in May 2009 while Hay, a corrections officer,

was assigned to assist Sergeant Donnie Maurer with the supervision and

oversight of Plaintiff's housing unit, "A-Dorm".  Maurer left A-Dorm to

supervise inmates at dinner and during his absence Hay ordered Plaintiff

into the housing unit's laundry room and sexually assaulted him.  Hay

subsequently pleaded guilty to felony battery and sexual misconduct with

an inmate.  ECF No. 4-11.

Plaintiff alleges that prior to the assault DOC had received numerous

complaints regarding staff violence and sexual misconduct by staff at

NFRC.  Plaintiff alleges that Defendants knew of such complaints and were

aware that inmates, including Plaintiff, were at risk.   Plaintiff alleges in

Count 1 that Defendant DOC is vicariously liable for the sexual assault by Hay, who was acting within the scope of his employment at the time of the assault.  ECF No. 4-11 at 8-9.

Plaintiff alleges in Count 2 that the DOC failed to use reasonable care to ensure his safety by failing to adequately monitor and observe Plaintiff despite knowing of the propensity for staff and/or sexual assaults at NFRC; failed to adequately monitor and supervise staff; failed to adequately train staff regarding staff misconduct including, but not limited to, sexual misconduct, despite knowing of the propensity for staff and/or sexual assaults at NFRC; failed to comply with applicable inmate to staff ratios; and failed to promulgate or enforce policies to ensure reasonably safe conditions of confinement, and be safe from staff and/or sexual assault, despite knowledge of the propensity for staff and/or sexual assaults at NFRC.  Plaintiff alleges that the DOC was aware that inmates, including Plaintiff, were at substantial risk of becoming victims of an assault at NFRC, and therefore that it was reasonably foreseeable that harm would befall Plaintiff either directly or indirectly as a result of the DOC's actions and omissions.  ECF No. 4-11 at 10-12.  Counts 3, 4, and 5 assert negligence claims individually against Defendants Culpepper, Comerford,

and Maurer.  Counts 6, 7, and 8 assert § 1983 deliberate-indifference

claims against Defendants Culpepper, Comerford, and Maurer in their

individual capacities.  ECF No. 4-11.

## B.  Defendants' Summary Judgment Motion

### 1.  *Count 1 (Vicarious Liability for Sexual Assault)*

The DOC argues that it may be vicariously liable for the sexual

assault committed by its employee, Hay, only if Hay did so while acting

within the course and scope of his employment and without bad faith.  As

support for this argument the DOC relies on Fla. Stat. § 768.28(9)(a),

which provides that the state or its agencies shall not be liable in tort for

the acts of an employee committed "while acting outside the course and

scope of his employment or committed in bad faith or with malicious

purpose or in a manner exhibiting wanton and willful disregard of human

rights, safety, or property."   The DOC contends that there is no dispute

that the sexual assault committed by Hay was outside the course and

scope of his employment as a corrections officer, and that there is no

evidence that any of the defendants ever authorized, encouraged, or

condoned Hay or any other officer in engaging in sexual misconduct with

an inmate.  ECF No. 158 at 19-20.

Florida law allows for the imposition of vicarious liability on a governmental entity for the intentional torts of its employee, but only when the tort is committed within the scope of employment.  Fla. Stat. § 768.28(1) (2006); *Lawrence v. Dunbar,* 919 F.2d 1525, 1528 (11th Cir.1990); *Roth v. Lawrence,* 2010 WL 2162900, at *1 (S.D. Fla. 2010). The Eleventh Circuit and the Florida Supreme Court define "within the scope of employment" somewhat differently.

According to the Eleventh Circuit, an act is within the scope of employment if the act (1) is the kind of act the employee is employed to perform, (2) was motivated, at least in part, by a purpose to serve the master, and (3) occurs substantially within the time and space of the employment.  *Lawrence,* 919 F.2d at 1528 (citing *Rabideau v. State,* 391 So.2d 283, 284 (Fla. Dist. Ct. App.1980)).

According to the Florida Supreme Court, an act is within the scope of employment if "the employee is acting within the apparent scope of his authority . . . to serve the interests of the employer," even if the act was not actually necessary or appropriate to serve the employer's interests. *Stinson v. Prevatt,* 84 Fla. 416, 418–19, 94 So. 656 (1922).  Thus, the Eleventh Circuit focuses on the kind of conduct involved in the act while

the Florida Supreme Court focuses on the employee's motivation behind the act. *Roth,* 2010 WL 2162900, at *1. Additionally, "[t]he question whether a tort committed by an agent is within the scope of his employment is normally to be determined by the jury, except in cases . . . in which the jury could reach only one conclusion that could be sustained." *City of Green Cove Springs v. Donaldson,* 348 F.2d 197, 202 (5th Cir.1965).

Under Florida law, "[g]enerally, sexual assaults and batteries by employees are held to be outside the scope of an employee's employment, and therefore, insufficient to impose vicarious liability on the employer." *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So.2d 353, 356–57 (Fla. 3d DCA 2001) (citations omitted); *see also Green Cove Springs*, 348 F.2d at 202. I

n *Casey v. City of Miami Beach*, 789 F.Supp.2d 1318 (S.D. Fla. 2011), the court determined on a motion to dismiss that, as a matter of law, § 768.28(9)(a) precluded the imposition of vicarious liability for a sexual battery committed by a police officer against an arrestee. The court found that the sexual battery was not "activated by any purpose to serve the City," and therefore that the officer was not acting within the course and

scope of his employment when he committed the assault.  *Casey*, 789 F.Supp.2d at 1320-21 (citing *Stinson,* 84 Fla. 416, 418-19; *Mason v. Fla. Sheriffs' Self-Ins. Fund,*, 699 So.2d 268, 270 (Fla. 5th DCA 1997)).  The court in *Casey* found the "conclusory" allegations of the complaint legally insufficient to sustain a vicarious-liability claim at the motion to dismiss stage with respect to the plaintiff's sexual-assault claim.  *See id*.

This Court previously found the allegations of the Complaint sufficient to withstand Defendants' motion to dismiss the vicarious-liability claim. *See* ECF Nos. 81, 94.  Now, in opposition to Defendants' summary judgment motion, Plaintiff points to evidence that the assault on Plaintiff occurred while Hay was on duty and assigned to supervise Plaintiff, within the confines of Plaintiff's assigned dorm, in a locked room to which Hay was given access by DOC, and during a time when Hay was left alone, unsupervised, with the inmates who remained behind in A-Dorm while Defendant Maurer exited the dorm to monitor other inmates at dinner.  *See* ECF No. 158-12 (McMillan IG Investigative Report).  The summary judgment evidence, viewed in a light most favorable to Plaintiff, makes this case distinguishable from *Casey* and others that have held under different circumstances that sexual assaults did not occur within the scope of an

officer's employment.

Several factors support this view.  Initially, while *generally* assaults and batteries by employees are held to be outside the scope of employment, "[a]n exception may exist where the tortfeasor was assisted in accomplishing the tort by virtue of the employer/employee relationship." *Iglesia*, 783 So.2d at 356 (citing *Hennagan v. Dept. of Hwy. Saf. & Motor Veh.*, 467 So.2d 748 (Fla. 1st DCA 1985)).  In *Hennagan*, a trooper lured a minor into his car and molested her under the pretext that she was a shoplifting suspect.  The court found that while the trooper's acts resulted in a criminal offense, such result did not preclude a determination that the acts were initiated in the course and scope of his employment and to serve the interests of his employer.  *Hennagan*, 467 So.2d at 749.

The fact that an act committed by an employee is illegal does not place it beyond the reach of vicarious liability.  "Courts have rejected this argument under 'the common-sense idea [that] municipal employees would not be hired to do something illegal, nor would their illegal acts presumptively be in furtherance of their employer's interests.' . . . Simply because an employee's act was illegal does not mean that the act falls outside the scope of their employment.  This reasoning 'would open a huge

gap in respondeat superior liability, if not eviscerate it.'"  *Watts v. City of Port St. Lucie, Florida*, 2016 WL 1110316 (S.D. Fla. 2016) (citing *Grider v. City of Auburg, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) ("[T]he question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted unconstitutionally.  The scope-of-employment inquiry is whether the employee police officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of authority (*i.e.*, job-related duties) and in furtherance of the employer's business.")); *see also McGhee v. Volusia County*, 679 So.2d 729, 733 (Fla. 1996) ("The fact that [the officer] may have intentionally abused his office does not in itself shield the sheriff from liability. . . . [t]he question must be put to the fact-finder whether [the employee] acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or willful disregard of human rights, safety, or property.").

Consistent with this authority is *Heckenlaible v. Va. Peninsula Reg. Jail Auth.*, 491 F.Supp.2d 544 (E.D. Va. 2007).  In *Heckenlaible*, a detainee was sexually assaulted by the sole correctional officer who was on duty on the medical unit where she was confined.  The officer escorted the plaintiff to the shower where he stared at her, then escorted her back to her cell.

He returned later and announced a "search,"  entered her cell, and sexually assaulted her.  The plaintiff alleged that the jail authority was liable under a theory of *respondeat superior*.  In denying the jail authority's motion for summary judgment, the court found that under the circumstances presented a reasonable juror could conclude that the officer's assault arose out of the performance of his duties: he was supervising the plaintiff and other inmates when the wrongful act occurred, and he entered her cell under the pretense of conducting a cell search. Thus, a reasonable juror could conclude that when the assault occurred the officer was "engaged in a service, namely, the supervision of [plaintiff], that was within the ordinary course of the jail authority's business. . . . A reasonable juror could reach this conclusion notwithstanding the fact that [the officer] violated the jail authority's policies when he had a sexual encounter with [plaintiff]."  *Heckenlaible*, 491 F.Supp.2d at 549.

This case is highly analogous to *Heckenlaible* and presents similar issues that should be resolved by the factfinder regarding the DOC's vicarious liability for Hay's actions.  The evidence that supports this conclusion may be summarized as follows.

At deposition, Plaintiff testified that on the night of the assault Hay

called him to the officers' station and informed Plaintiff that Hay had given

condoms to another inmate, Tony Taylor, who had been interested in

having a sexual relationship with Plaintiff prior to Taylor's release.  Hay told

Plaintiff that Plaintiff would "pay" for the condoms he gave Taylor.  Plaintiff

returned to his bunk.  Later, as Plaintiff was lining up to go to chow, Hay

announced: "McMillan, I need you to help me in the laundry room.  You can

go to chow late[.]"  Plaintiff testified that he "always help[s] out in the

laundry."  After the inmates who were going to chow left the dorm, Hay

took Plaintiff to the laundry room.  Plaintiff testified that he accompanied

Hay to the laundry room "[b]ecause he was the officer, and he told me that

he needed me to . . . help in the laundry room."   Hay and Plaintiff entered

the laundry room and Hay locked the door, which was the standard

procedure when inmates were working in the laundry room.  Plaintiff

continued to believe that Hay wanted him to assist with the laundry until

Hay ordered Plaintiff to perform oral sex on him.  Afterward, Hay

threatened to kill Plaintiff if he reported the assault.  Plaintiff gave his t-

shirt, which had Hay's semen on it, to another inmate for safekeeping.

ECF No. 158-7 at 44-66.

        Plaintiff testified that after he decided to report the assault he wanted

the warden and the inspector general to be present because he was afraid that something was going to happen to him. *Id*. at 81. He testified that other inmates spoke on the compound about "horrible stories" of inmates getting beaten, gassed, and retaliated against, and that it was "clear, you know, that prison . . . was ran with an iron fist[.]" *Id*. at 83. "[I]t was very well-known that, at that prison, things were happening and being covered up. And I thought that some kind of way it would end all up on me, so I didn't want to say nothing. I just wanted to do my time and just go home." *Id*. at 85. Plaintiff's fears of suffering repercussions for reporting the attack were not unfounded. While being transported from NFRC after the assault, an officer made a comment in front of Plaintiff and other inmates about someone "sucking d–k" to get off of the compound. *Id*. at 99.

The summary judgment evidence reflects that the subsequent investigation into the assault was severely flawed. The Inspector General's report of the investigation reflects that an incident report was forwarded by Sergeant Jose Moreno on May 13, 2009. ECF No. 158-12 at 5-52. Moreno was the officer to whom Plaintiff reported the assault and who recovered Plaintiff's t-shirt with the physical evidence. Plaintiff was interviewed by Inspector Jennifer Brown. The report was entered into the

"Management Information Notification System" (MINS) and assigned for investigation on May 14, 2009.  However, Hay was not interviewed, nor were any other officers or inmates.  Hay learned that he was being investigated and voluntarily resigned from NFRC on May 18, 2009, without having been interviewed.  The IG report includes an email Hay sent to DOC officials over a year later in July 2010 inquiring about the status of the investigation and his employability.  In the email, Hay claims that prior to resigning he asked the Warden about the investigation and the Warden laughed and told him "we know [you're] not guilty" and to let it "breezer" over.  ECF No. 158-12 at 49 (email exhibit to IG report).

In June 2010, the investigation was reassigned to a different inspector, Cecil Smith.  *Id.*  It was not until the case was reassigned in June 2010 – over a year after the assault – that a search warrant finally was served for buccal swabs from Hay for DNA analysis and comparison with the physical evidence from Plaintiff's t-shirt.  This evidence resulted in the criminal charges against Hay.  *Id*. at 10-11. The IG report discloses that Inspector Brown had obtained a search warrant for buccal swabs that was never served, and that Brown lied to a supervisor about having sent buccal swabs from Hay to the FDLE for analysis.  The IG report states that Brown

was "extraordinarily dismissed" from her job.  ECF No. 158-12 at 43-44.

Brown's deposition testimony suggests that most of the investigations she

handled during her time at NFRC were poorly managed with little or no

oversight by DOC supervisors.  ECF No. 171-4 at 18.

Although Plaintiff's assault was assigned an internal "tracking

number" pursuant to DOC policy for reporting pursuant to the Prison Rape

Elimination Act (PREA), the DOC has been unable to provide any evidence

that it complied with PREA reporting requirements with respect to the

assault.  *See* ECF No. 158-15 at 13 (DOC's interrogatory answers); ECF

No. 158-17 (Affidavit of David Ensley).

Plaintiff points to evidence that the laundry room where the assault

took place was unmonitored and was recognized as a location for

misconduct to occur.  *See* ECF No. 158-2 at 55 (deposition of Samuel

Culpepper); ECF No. 171-5 at 2 (declaration of John Crockett); ECF No.

171-6 at 24 (deposition of Arthur Rountree); ECF No. 158-9 at 12-13

(deposition of Richard Comerford).  For example, Defendant Culpepper,

the NFRC warden at the time of the assault, testified that the style of

dormitories and laundry rooms at NFRC had been prevalent for years, that

the laundry rooms were low-visibility areas, and that there were "a lot of

allegations about inappropriate sexual misconduct by staff" in the laundry rooms.  He testified "I'm glad we got cameras in there now."  ECF No. 158-2 at 55.

A key facet of Plaintiff's claims in this case is that inmate abuse and intimidation were ingrained in the culture and correctional practices at NFRC.   In addition to the general knowledge of inmate abuse that Plaintiff described in his testimony, other evidence in support of this assertion includes the testimony of Captain Dwayne Searcy, a NWFRC corrections officer who described a culture that encouraged the unjustified use of chemical spray against inmates (known as gassing "on the house") and repercussions for officers who failed to take such actions when ordered to do so.  ECF No. 171-3 at 21-22.  Searcy also stated that sexual relationships between inmates and staff were "common," although he could not relate particular episodes.  *Id*. at 48-49.  Sergeant Christopher Christmas, Sergeant Ronnie Bowers, and Captain Tolbert Seiffert testified that inmates were gassed without provocation.  ECF Nos. 171-9 at 8, 35 (Christmas); 171-10 at 9-11 (Bowers); 171-11 at 31-32 (Seiffert).  Captain Seiffert testified that complaints about staff abuse included complaints of sexual abuse.  ECF No. 171-11 at 8-9.

Inspector Arthur Rountree described NFRC as one of the "more prevalent places" for investigations under the PREA and that NFRC has a larger number of PREA complaints.  ECF No. 171-6 at 58.  Rountree was a Senior Inspector at NFRC and was an Inspector Supervisor at the time of his deposition.  ECF No. 171-6.  Rountree testified that he investigated other cases involving sexual assaults or violence in areas lacking video surveillance at prisons, including NFRC, between 2004 and 2009, and that the lack of video surveillance was mentioned in his reports to the DOC. *Id*. at 25.  A female NFRC officer, Tammy Pate, was a victim of sexual harassment and assault by another officer, and filed suit against the DOC after DOC failed to take any corrective action.  ECF No. 171-13.

Another inmate at NFRC, Reshawn Brown, accused Officer Hay of committing a sexual assault prior to the assault on Plaintiff, and specifically alleged that he personally gave Maurer a grievance about being sexually assaulted by Hay.  Brown alleged that he attempted to give a grievance to Warden Culpepper, but was prevented from doing so by an officer.  ECF No. 171-14 (declaration of Reshawn Brown).[2]

---

[2]Defendants assert that at his deposition Reshawn Brown refused to testify about the incident.  ECF No. 158 at 15.  Plaintiff contends that Brown's deposition took place in an open area at a DOC facility in the presence of DOC officers and other inmates, and Brown

Captain Tolbert Seiffert testified that he raised concerns at NFRC regarding abusive forms of inmate discipline such as property restrictions that stripped inmates of all bedding and clothing on cold nights and unjustified use of chemical spray.  He testified that when he complained to the IG's office about abusive practices, his employment was terminated. ECF No. 171-11 at 27-28.  The details of Captain Seiffert's dismissal are set forth in the Public Employees Relations Commission's (PERC) Hearing Officer's Recommended Order attached as an exhibit to Warden Culpepper's deposition in a federal civil suit filed by Captain Seiffert against the DOC.  ECF No. 158-6 at 140-50.  Captain Seiffert was a veteran corrections officer with only one written reprimand in his record prior to 2008.  While at NFRC in 2008— and coinciding with the time that Seiffert made anonymous complaints to the IG about inmate disciplinary practices— Seiffert began to receive disciplinary employment actions from his immediate supervisor, Major Godwin, as well as a five day suspension without pay from Warden Culpepper.  Seiffert received unacceptable performance ratings and was placed on a "performance improvement

---

refused to respond out of fear of retaliation.  Plaintiff argues, and the undersigned agrees, that questions regarding Brown's credibility are inappropriate for determination at the summary judgment stage.  ECF No. 171 at 13.

plan."  In March 2009, Seiffert gave testimony to an inspector relating to the excessive force allegations and abusive property restrictions.  Warden Culpepper was found to have committed a "policy failure" in connection with the property restrictions although the excessive force claims were not substantiated by the investigation.   Warden Culpepper was subsequently transferred to a different prison.  Seiffert's employment was terminated in August 2009.  However, the PERC found that Seiffert had not been terminated for cause, and he was reinstated with back pay and benefits.  *Id.*

Seiffert testified in his deposition in this case that Warden Culpepper encouraged and "turn[ed] his head" to inmate abuse by guards at NFRC, and that Assistant Warden Comerford either had to look the other way or be part of it.  ECF No. 171-11 at 33-34.  Seiffert testified that when he was facing a five-day suspension Warden Culpepper told him he could make the suspension "disappear" but that he needed Seiffert to "take care of business."  Culpepper told Seiffert "when you walk on that compound, I want inmates to shake."  *Id*. at 35.

Captain Searcy also testified that Assistant Warden Comerford told him to use chemical spray against an inmate without justification.  Warden

Culpepper told officers to "get with the program," which Captain Searcy believed was a threat against officers who would not perform "gassing on the house" against inmates. ECF No. 171-3 at 10, 21.

Sergeant Bowers testified that officers who spoke against the administration or who would not go along with abuse of inmates would be retaliated against. ECF No. 171-10 at 9. He testified that officers falsified reports in order to justify gassing inmates. *Id*. at 10, 13. Bowers gave a statement to an IG investigator about inmate property restrictions and uses of force. *Id.* at 16-17. Another officer, Captain Holden, wanted to get Bowers involved in gassing inmates in the confinement unit. When Bowers refused, his work assignment was changed. *Id*. at 22-26. Bowers testified that he believed Culpepper retaliated against his son, who also works as a corrections officer, by giving him a 10-day suspension immediately after Bowers appeared to testify on Seiffert's behalf in the PERC proceeding. *Id*. at 37.

Sergeant Christmas testified that reports were falsified in order to justify gassing inmates. ECF No. 171-9 at 6-7. He testified that gassing without provocation was a regular occurrence, and that he specifically heard Warden Culpepper order the gassing of an inmate who was not

disruptive.  *Id*. at 9.  Sergeant Christmas testified that Seiffert was subject to retaliation for reporting abuse, and that Christmas also expected retaliation because of his testimony.  *Id.* at 12.  All of the officers who reported abuse to the IG – Seiffert, Bowers, and Searcy – were subject to retaliation.  Christmas was "written up" and subjected to discipline for a two-year-old attendance issue after he provided an affidavit to the IG.  *Id.* 15-18.  Christmas heard Warden Culpepper tell Seiffert to use gas on an inmate who was not disruptive, and tell Seiffert to "get with the program" or he would be gone.  *Id*. at 22-23.   He heard Major Godwin tell other officers to spray an inmate who was only yelling, and that if they refused their careers would not be very long with the DOC.  *Id.* at 28.

Defendants Culpepper and Comerford both deny in their deposition testimony and affidavits that they encouraged or condoned any forms of unjustified inmate discipline.  *See* ECF No. 158 at 8-11 (summarizing testimony).  Such evidence is clearly in conflict with that of the corrections officers' testimony discussed above, and creates material issues of disputed fact.

Plaintiff's expert, Ron D. McAndrew, a career corrections professional in the Florida DOC, opined that NFRC "exhibited a number of

patterns that combined to make the facility a very dangerous setting for both inmates and staff." ECF No. 171-17 at 6. Mr. McAndrew's review included inmate grievances, use of force reports, DOC investigative documents, officer complaints, and other documents. Mr. McAndrew concluded from his review that NFRC had a history of serious levels of staff-on-inmate violence that was not properly investigated or questioned, a pattern of retaliation against officers, and a failure to adequately monitor and train staff, all of which created a serious risk of harm to inmates, including Plaintiff.

Mr. McAndrew opined that the extremely low rates of substantiation of inmate complaints reflects that incidents were not being fully or properly investigated. *Id*. at 7. Mr. McAndrew's opinion addresses an audit by the Correctional Medical Authority ("CMA") that followed officers' complaints of abuses and/or unjustified uses of force at NFRC. Following the audit, the CMA wrote a letter to the DOC Inspector General expressing concern about the allegations, but no follow-up investigation was performed. *Id*. at 9.[3] Mr. McAndrew opines that when allegations of staff abuse are not

---

[3] DOC Senior Inspector Debra Carter-Arant testified that in March 2009 she was assigned to look into the CMA audit and the allegations made by NFRC officers, including Captain Seiffert and Captain Searcy, regarding improper uses of force. Carter-Arant was

investigated, officers are discouraged from reporting abuse, and physical

and/or sexual violence is allowed to flourish, officers are more likely to use

force with impunity, without fear of investigation or repercussion.  *Id*. at 10,

12.  He further opines that the pattern of retaliation against officers who

reported abuse leads to systemic problems such as those he identifies at

NFRC.  *Id*. at 10.  Mr. McAndrew also identified violations in NFRC's

handling of inmate grievances, in violation of established correctional

standards, which also precluded proper investigation of abuse claims.

McAndrew opined, based on his review, that NFRC staff, including

Culpepper and Comerford, failed to properly implement PREA

requirements and internal DOC procedures regarding investigation and

reporting of sexual abuse.  *Id*. at 14-18.

The DOC points to the opinion of its expert, Max Linn, PhD, who

opined that the statistically relevant data available for review supports a

conclusion that during the years at issue (May 1, 2004 to May 13, 2009),

the substantiation rates of allegations of sexual victimization at NFRC were

consistent with the rates established at other Florida prisons during the

---

subsequently told that the investigation would not proceed because the uses of force had
already been approved and would not be reopened.  ECF No. 171-20 at 18-26.  Therefore,
no officers implicated in the alleged improper uses of force were interviewed.  *Id*.

same time period.  Dr. Linn also states that Plaintiff's expert has provided

no statistically valid anecdotal data collection and analysis regarding

allegations and investigations of the abuse of inmates at NFRC.  ECF No.

158-14.

While the statistical evidence regarding sexual victimization is plainly

relevant, statistics alone do not explain the events underlying Plaintiff's

assault, particularly in light of the testimonial evidence, summarized above,

from which reasonable jurors could find that officers and inmates alike

were discouraged from reporting incidents of abuse.  There is evidence

that such incidents, including the assault against Plaintiff, were poorly

investigated, calling into question the validity of the low substantiation

rates.  These matters go to the weight and credibility of the evidence and

are therefore matters for the finder of fact.

In support of his claim of a widespread pattern of abuse, Plaintiff

points to use-of-force reports showing dramatic increases in such reports

after Warden Culpepper's arrival.  *See* ECF No. 171 at 13-14.  Defendants

contend that Plaintiff has not adduced any information comparing the

numbers of authorized uses of force with other institutions, and that

evidence regarding authorized uses of force is not relevant or material to

establishing a pattern of abuse and cannot serve as a basis for defeating

summary judgment.  ECF No. 175.  As discussed above, Plaintiff has

come forward with some evidence that authorized use-of-force reports

were falsified to justify the gratuitous use of chemical spray.  Therefore, the

undersigned finds that consideration of such evidence is relevant for

purposes of determining whether there is sufficient evidence of a pattern of

abuse to defeat summary judgment.  The issue whether Plaintiff has

established the validity of the numbers of reports at NFRC by, for example,

comparability to other institutions goes to the weight and credibility of such

evidence which are issues for the finder of fact.

In sum, on this evidence, a reasonable juror could conclude that Hay

was acting within the course and scope of his employment at the time the

assault against Plaintiff occurred.  Hay was clearly engaged in supervisory

duties over Plaintiff and the other inmates in A-Dorm.  Hay exercised his

authority over Plaintiff to order him to the laundry room under the pretext of

requiring assistance with the laundry.   The assault occurred within the

time and space of Hay's employment.  Hay arguably took advantage of the

fact that he was the only officer left on duty in A-Dorm to isolate and

assault Plaintiff in an area that was known to provide an unmonitored

space for misconduct.  Plaintiff has come forward with evidence that

unjustified inmate abuse occurred at NFRC and was tolerated or even

encouraged by prison officials.  It is at least arguable that Hay's abuse of

Plaintiff was in service of that culture.  A reasonable jury could conclude

that a culture that tolerated or encouraged inmate abuse allowed Hay to

believe he either was authorized to abuse an inmate or could act with

impunity in abusing an inmate.  A reasonable jury could further conclude

that the gross mishandling of the subsequent investigation is evidence of a

culture that endorsed or sought to conceal abusive activities at NFRC.

Further, given the circumstances of the assault, as set against the

evidence of the institutional practices at NFRC, the issue whether Hay's

actions were committed in bad faith or with malicious purpose or wantonly

and willfully under Fla. Stat. § 768.28(9)(a) are also questions for the

factfinder.  *See McGhee*, 679 So.2d at 733; *see also Burnett v. Miami-*

*Dade County*, 2007 WL 1225451 *6-7 (S.D. Fla. 2007) (while acts

described suggested bad faith, malicious purpose, or wanton and willful

disregard, such issues are frequently questions for the jury).[4]

---

[4]Defendant's summary judgment argument focuses exclusively on the "course and scope of employment" clause of the statute.

Therefore, on this record, the undersigned concludes that the DOC is not entitled to summary judgment on the issue of immunity from vicarious liability for Hay's intentional tort under  Fla. Stat. § 768.28(9)(a) as to Count 1.

### 2.   Counts 2, 3, 4, 5 (Negligence of DOC and Individual Defendants)

The DOC argues that it is not liable to Plaintiff on a theory of negligence because Hay's actions were "so clearly outside the course and scope of his employment" and therefore were not foreseeable.  ECF. No. 158 at 21.   Plaintiff's negligence claim against the DOC, however, is premised on the DOC's own negligence in: failing to provide adequate monitoring of Plaintiff; failing to provide adequate monitoring of staff; failing to train staff; failing to comply with recommended staff ratios; and failing to ensure safe conditions of confinement.  ECF No. 4-11 at 10-12.

The DOC owes the inmates in its custody a duty to use reasonable care.  *See Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985); *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1119 (11th Cir. 2005).   Further, Fla. Stat. § 768.28(9)(a) does not cloak the DOC, as an agency of the state, with immunity from claims based on its own

negligence.  *See* Fla. Stat. § 768.28(9)(a) ("The . . . remedy for injury or

damage suffered as a result of an act, event, or omission of an officer,

employee, or agent of the state or any of its subdivisions or constitutional

officers shall be by action against the governmental entity.").

In this case there are material issues of fact with respect to the

DOC's own negligence that are sufficient to defeat summary judgment.

The DOC contends that Hay's actions were not foreseeable, but, as

discussed above, there is evidence that the laundry areas and other

unmonitored areas were recognized as sites for improper activity, including

sexual activity and assaults to occur.  Warden Culpepper testified that it

"wasn't kosher" for staff to take inmates into the laundry room for

"counseling and things of that nature," but he was unsure whether that rule

was written and DOC has identified no evidence that Hay specifically

received any training regarding that rule.  ECF No. 158-2 at 52.

Further, there are genuine fact issues regarding whether permitting

one guard, Hay, to remain behind as the sole supervisor of A-Dorm was

reasonable to provide for Plaintiff's safety.  Paul Wesley Kirkland, Jr., the

Bureau Chief of Security Operations for DOC, testified that the DOC's

"post chart" (staffing chart) for A-Dorm in May 2009 consisted of one

sergeant and two correctional officers (CO's).  ECF No. 171-2 at 46.

Institutional staffing with one sergeant and one CO was considered "Level

1" staffing, or a critical staffing level, which limited the type of programs

that could be conducted.  *Id*. at 47.  Mr. Kirkland testified that "ideal policy

is that you had everything staffed and you wouldn't have a need to do that."

*Id*. at 49.  Mr. Kirkland conceded that it is a "recognizable risk" to leave a

guard in the dorm by himself, and that the staffing policies are in place to

try to reduce the level of risk.  *Id.* at 52.  Under these circumstances, the

DOC is not entitled to summary judgment on Plaintiff's negligence claims.

With respect to the negligence claims against the individual

Defendants, Fla. Stat. § 768.28(9)(a) provides that an individual officer,

employee, or agent of the state can only be held personally liable in tort if

that individual acted in bad faith or with malicious purpose or in a manner

exhibiting wanton and willful disregard of human rights, safety or property.

In this case, Plaintiff alleges in Counts 3-5 that each individual Defendant

(Culpepper, Comerford, and Maurer) is liable for "the negligent conduct,

gross negligent conduct, and/or intentional actions or omissions taken with

bad faith, malicious purpose and/or in a manner exhibiting wanton and

willful disregard of human rights, safety, or property with respect to the

care and supervision of Lemuel McMillan while he was incarcerated at

Northwest Florida Reception Center."  ECF No. 4-11.

As summarized above, the summary judgment evidence, viewed in a

light most favorable to Plaintiff, is sufficient to create material issues of fact

with respect to Plaintiff's negligence claims against the individual

Defendants.  As to Defendants Culpepper and Comerford, there is

evidence that Defendants ordered or encouraged inmate abuse and

intimidation and retaliated against officers who failed to engage in such

practices or who reported such practices.  There are genuine issues of

material fact regarding whether Warden Culpepper's and Assistant Warden

Comerford's actions created or permitted an environment that

unreasonably put Plaintiff at risk of abuse by staff.  Plaintiff has come

forward with evidence in the form of Reshawn Brown's declaration that

Defendant Maurer knew that Hay had committed a prior sexual assault and

failed to investigate or report the incident.  Although Defendants cast

considerable doubt on Reshawn Brown's claim, that is a matter of

credibility for the jury to consider.

In sum, on this record the undersigned concludes that Defendants

are not entitled to summary judgment on Plaintiff's negligence claims in

Counts 2, 3, 4, and 5.

### 3. Counts 6, 7, 8 (Deliberate Indifference)

Defendants contend that they are entitled to summary judgment on Plaintiff's constitutional claims under § 1983 because they cannot be liable solely under a theory of *respondeat superior* and Plaintiff has not alleged personal participation by Culpepper, Comerford, or Maurer in Hay's sexual assault, and Plaintiff has produced no evidence in support of his claims of widespread abuse of inmates amounting to deliberate indifference.  ECF No. 158 at 23-27.

It is well settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id*. at 833. Further, a supervisor can be liable under 42 U.S.C. § 1983 for a subordinate's action when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation.  *Mathews v. Crosby*, 480 F. 3d 1265, 1270 (11th

Cir. 2007).  Such causal connection can be established by showing: "1) a history of widespread abuse [that] put[ ] the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fail[ed] to do so; 2) a supervisor's custom or policy result[ed] in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Mathews*, 480 F.3d at 1270; *see also Gonzalez v. Reno,* 325 F.3d 1228, 1234 (11th Cir. 2003); *Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir. 2003).

In this case, as extensively discussed above, Plaintiff has come forward with evidence sufficient to create disputed fact issues under alternate theories of causation under the above authority.  There is disputed evidence as to whether widespread abuse occurred, there is disputed evidence as to whether the supervisory defendants' custom or policies fostered a culture of abuse, and there is disputed evidence as to whether the supervisory defendants actually ordered subordinates to engage in the abuse of inmates such that Hay was empowered to abuse Plaintiff or believed he could do so with impunity.  Plaintiff has come

forward with evidence that the supervisory defendants knew the unmonitored laundry room created a risk for inmate abuse and was used for improper purposes because it was unmonitored, and failed to take corrective action.

In the case of defendant Maurer, there is disputed evidence as to whether he had actual knowledge that Hay had committed a previous sexual assault against another inmate, Reshawn Brown, such that it amounted to deliberate indifference to leave Hay unsupervised with Plaintiff and other inmates in A-Dorm on the night of the assault.

Accordingly, Defendants have not shown that they are entitled to summary judgment on Plaintiff's deliberate-indifference claim, and these claims should proceed to trial.[5]

---

[5]In Defendants' reply to Plaintiff's response in opposition to summary judgment, Defendants reference "qualified immunity" and state that the "department has previously asserted the individual defendants' right to qualified immunity, and will not recite its arguments again in this reply." ECF No. 175 at 18. The Court previously denied Defendants' motion to dismiss asserting qualified immunity. *See* ECF Nos. 81, 94. Defendants' summary judgment motion, ECF No. 158, does not reassert qualified immunity as a separate ground for summary judgment, and it is unclear whether Defendants are attempting to raise it by way of their reply, which would be improper. Had they raised qualified immunity as a ground in the summary judgment motion, for the reasons set forth herein, the undersigned would recommend that summary judgment be denied.

**C.    Defendants' Failure to Answer Complaint**

Plaintiff contends that summary judgment is also inappropriate because Defendants in this case failed to formally file an answer to the Complaint, and therefore, under Fed. R. Civ. P. 8(b)(6), the allegations of the Complaint are deemed admitted.  ECF No. 171 at 48-50. Defendants respond that the failure to formally answer the complaint was clearly inadvertent and was attributable to staffing changes that occurred in this case following its removal to this court.  Defendants point out that Plaintiff has been fully apprised by the motion to dismiss and the instant summary judgment of the defenses to the complaint.  ECF No. 175 at 19-20.

Under these circumstances, the undersigned agrees that Plaintiff's assertion is not well-taken, and the Defendants' failure to formally answer the complaint is not an appropriate basis for denial of summary judgment.

## III.  CONCLUSION

For the foregoing reasons, it is respectfully **RECOMMENDED** that Defendants Department of Corrections, Samuel Culpepper, Richard Comerford and Donnie G. Maurer's Motion for Summary Judgment, ECF No. 158, should be **DENIED** because there are genuine issues of material

fact, and this case should be set for trial.

**IN CHAMBERS**  this 8th day of July 2016.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**